**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **MEGAN WEIDNER,** | ) | **CASE NO. 4:01 CV  002864** |
| | ) | |
| **PLAINTIFF** | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | **MEMORANDUM OPINION** |
| ***et al.*** | ) | **AND ORDER** |
| | ) | |
| **DEFENDANTS** | ) | |

This matter came before the Court on January 11, 2005 for a trial without jury.  At the close of all evidence, the Court adjourned the proceedings and took the matter under advisement.

## I.    RULE 52 OF THE FEDERAL RULES FOR CIVIL PROCEDURE

Rule 52 of the Federal Rules of Civil Procedure provides, in pertinent part:

In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58. . . . Requests for findings of fact, whether based on oral or documentary evidence shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. . . . .It will be sufficient if the findings of fact and conclusions of law are stated orally and recorded in open court following the close of the evidence or appear in an

-1-

opinion or memorandum decision filed by the court.

FED. R. CIV. P. 52(a). It follows that Rule 52(a) demands great deference to the trial court's determinations regarding the credibility of witnesses. See Anderson v. Bessemer City, 470 U.S. 564, 575 (1985).

Accordingly, the Court hereby issues the following findings of fact and conclusions of law.

## II. FINDINGS OF FACT

### A. The United States Marine Corps' Policy Regarding the Use and Operation of Government Owned Vehicles

At all times relevant, the United States Marine Corps ("USMC") operated a regional headquarters for recruitment in Middleburg Heights, Ohio ("RS Cleveland") which had command jurisdiction for the eleven recruiting substations ("RSSs") located throughout Northern Ohio and Western Pennsylvania. See (Tr. of Trial Proceedings Before the Hon. Peter C. Economus United States District Court Judge on Jan. 11, 2005 ("Tr.") at 26; Telephone Dep. of Lt. Col. Rickey L. Grabowski ("Grabowski Dep.") at 10-11). Lt. Col. Dario William Valli ("Lt. Col. Valli") served as the Recruiting Station Commanding Officer at RS Cleveland. See (Tr. at 15). In his capacity as Recruiting Station Commanding Officer, Lt. Col. Valli was responsible for ensuring that the recruiters stationed throughout the RS Cleveland jurisdiction understood and acted in compliance with USMC policies. See (Tr. at 15-16, 50).

A Non-Commissioned Officer In Charge ("NCOIC") stationed at each RSS had responsibility for supervising the daily activities of all recruiters. See (Tr. at 15, 26, 50;

-2-

Grabowski Dep. at 13).   The defendant, Gunnery Sergeant Nicholas P. Yukich, III ("Gy Sgt Yukich"), served as the NCOIC of RSS-Youngstown.   See (Tr. at 27; Dep. of Nicholas P. Yukich, III Feb. 28, 2002 ("Yukich Dep.") at 12-13).   GySgt. Yukich supervised six recruiters variously stationed at three local offices – (1) Salem, OH, (2) Youngstown / Boardman, OH, and (3) Warren, OH.   See (Tr. at 27; Yukich Dep. at 12-13).   The defendant, Staff Sergeant Anthony J. Parker ("SSgt. Parker"), was a recruiter stationed at the Youngstown/Boardman, OH local office.  See (Tr. at 101-103; Yukich Dep. at 13-14).

As the NCOIC, GySgt. Yukich had the responsibility for assigning government-owned-vehicles ("GOVs") to each recruiter.[1]   See (Tr. at 48-53; Grabowski Dep. at 15-17; Yukich Dep. at 26-27).   GySgt. Yukich assigned to SSgt. Parker a 1998 Plymouth Breeze, green in color, bearing license plate number G1216155.  See (Tr. at 102).  SSgt. Parker possessed one set of keys for the vehicle, while GySgt. Yukich  stored a duplicate set of keys at the Salem, OH local office.  See (Tr. at 145-46, 158; Yukich Dep. at 27-29).

USMC policy required recruiters to use GOVs only in the performance of official activities.   See (Tr. at 102-104, 124, 130-31, 165, 168; Yukich Dep. at 29,32; Grabowski Dep. at 17-21, 36).   Specifically, the policy in effect for the RS Cleveland command jurisdiction provided:

> 1.    Per the reference, blanket authority to commute from domicile to duty is not authorized by this command.   Justification for domicile to duty must be submitted to Headquarters, 4th Marine Corps District for approval and will be reviewed semiannually.

---

[1]The USMC obtained vehicles from the General Services Administration ("GSA") for use by recruiters.

2.     Under no circumstances will anyone commute from their residence to the nearest recruiting facility (RS, RSS, PCS, etc.) pick up a government owned vehicle (GOV) and proceed to their designated place of duty in the GOV.

3.     When it is determined to be infeasible or impracticable for the recruiter first to proceed to an office location where the vehicle is normally kept, he will be authorized domicile to duty. Instances of infeasible or impracticable situations will only be interpreted as occasions when official business is in the opposite direction of the normal recruiting office location. Every instance of domicile to duty travel will be requested from and approved by, the Executive Officer.  A log book will be kept at the RS Headquarters to record every instance of domicile to duty travel.

4.     As members of this command, the performance of your duties directly impacts the recruiting mission.  Everything that we do must support that focus.  Commuting from domicile to duty is costly and unauthorized.  This is a waste of limited funding, which can be utilized in many other well-deserved areas.

5.     The sole responsibility of each of you is to ensure that any infraction from this command policy is identified and reported. Utilizing GOV's for personal financial gain negatively impacts the recruiting mission and will be acted upon with punitive action.

6.     The enclosure will be completed by all command members, maintained accordingly by the logistics office, and will be incorporated as part of the logistics check-in procedures.

(Gov.'s Ex. Aq); see also (Tr. at 24-27, 124).

## B.     The December 22, 2000 Recruiters' Meeting

On December 22, 2000, GySgt. Yukich summoned all recruiters stationed at RSS-Youngstown to a meeting whereby he discussed issues relating to the recruiters' failure to meet certain performance standards, as well as ordered restrictions for the upcoming holiday weekend.  See (Tr. at 110-114,170-71; Yukich Dep. at 34-35).  GySgt. Yukich explicitly

ordered all of the recruiters to return to their assigned offices following the meeting, park the GOVs at the recruiters' assigned offices, and refrain from using the GOVs until December 26, 2000.  See (Tr. at 138-39, 146-47, 205-06).  SSgt. Parker attended the meeting and interpreted GySgt. Yukich's orders as prohibiting any recruiter from using a GOV during the evening of December 22, 2000 through December 26, 2000.  See (Tr. at 110-114, 138-39, 146-47).

### C.     The December 24, 2000 Accident Involving SSgt. Parker's Assigned GOV

On December 24, 2000, the GOV assigned to SSgt. Parker struck the plaintiff, Megan Weidner ("Weidner"), while Weidner was standing off the roadway (identified as the Salt Springs Road exit ramp from Interstate 680) in order to observe an occupant of a vehicle in which she was riding change a flat tire.  See (Tr. at 3-4).  The plaintiff did not observe the driver of the vehicle.  See (Tr. at 62).

The Youngstown Police Department ("YPD") discovered SSgt. Parker's abandoned and damaged GOV several blocks from the scene of the plaintiff's accident.  See (Tr. at 83 & Gov.'s Ex. As).  The YPD later discovered that SSgt. Parker had reported the vehicle stolen from the Youngstown/Boardman, OH local office.  See (Tr. at 83-84).

YPD Detective David Lomax ("Det. Lomax") conducted an investigation into the plaintiff's accident during which he interviewed SSgt. Parker.  See (Tr. at 90-92).  SSgt. Parker informed Det. Lomax that he parked his vehicle at the Youngstown/Boardman, OH recruiting office on December 22, 2000 in accordance with GySgt. Yukich's orders.  See (Tr. at 91, 139).  He thereafter went Christmas shopping with his wife at a nearby mall.  See (Tr.

at 91).  SSgt. Parker relayed that he purchased a gift for his wife and placed it in the GOV for storage until Christmas.  See (Tr. at 91, 140).  When SSgt Parker went to retrieve the gift on December 25, 2000, he purportedly discovered the vehicle missing and reported it stolen. See (Tr. at 91, 140).

Det. Lomax additionally interviewed Regina Maddox ("Maddox"), SSgt. Parker's paramour, who advised that SSgt. Parker accompanied her to a Christmas party on December 24, 2000.  See (Tr. at 84, 86-87; V.S. of Regina Maddox ("Maddox V.S.")).  Maddox recounted that she consumed several alcoholic beverages with Parker and the pair departed from the party in separate vehicles — Parker driving his assigned GOV and Maddox driving her personal vehicle.  See (Tr. at 84; Maddox V.S.); see also (Dep. of Shelika Wilder, Tues. Jan. 4, 2005 Vol. III at 55, 60 & Ex. As attached thereto).  Maddox further recounted that she and Parker began to race while driving on the interstate.  See (Tr. at 85; Maddox V.S.). Maddox first arrived at their destination and soon received a telephone call from Parker.  See (Tr. at 85; Maddox V.S.).  Parker relayed that he had been involved in an accident and requested Maddox to pick him up near the scene of the accident.  See (Tr. at 85; Maddox V.S.).  Maddox reported that she proceeded to the prescribed location and delivered Parker to his home.  See (Tr. at 85; Maddox V.S.).

Det. Lomax subsequently interviewed several persons that observed SSgt. Parker accompany Maddox at the December 24, 2000 party.  See (Tr. at 94-95).  Detective Lomax ultimately concluded that SSgt. Parker was the driver of the GOV that struck the plaintiff. See (Tr. at 91-93 & Gov't's Ex. As).

Based on Det. Lomax's investigation, see (Tr. at 88), the Mahoning County, Ohio

Prosecutor's Office charged SSgt. Parker with Vehicular Assault, a fourth degree felony,  as codified at OHIO REV. CODE § 2903.08(A)(2)(B)(2).

### D.  The Instant Proceedings

The plaintiff meanwhile filed a Complaint in this Court against SSgt. Parker, GySgt. Yukich and the United States of America, asserting three claims for relief: (1) a claim advanced pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671-2680; (2) a negligence claim advanced against SSgt. Parker; and (3) a negligence claim asserted against GySgt. Yukich.  See (Dkt. # 1).  The Government subsequently filed a notice of substitution pursuant to 28 U.S.C. § 2679(d)(1) as to GySgt. Yukich therein certifying that GySgt. Yukich acted within the scope and course of his employment at the time the plaintiff's claims arose.[2] See (Dkt. # 17).  The Government, however, did not file a notice of substitution as to SSgt. Parker.

At the request of the parties, the Court stayed the case during the pendency of the SSgt. Parker's criminal trial.  See (Dkt. # 20).  On December 9, 2003, SSgt. Parker entered into a plea of no contest to the charge of assault, a violation of OHIO REV. CODE

---

[2]Section 2679(d)(1) of title 28 of the United States Code provides:

Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1). Under 28 C.F.R. § 15.3, the Attorney General has delegated to the United States Attorney the authority to provide § 2679(d) certification.

2903.19(B)(C).   See  (Dkt. # 22, Ex. # 1).   The Court consequently lifted the stay and, following a series of status conferences, the matter proceeded to trial without jury.

### E. Whether SSgt. Parker Operated the GOV That Struck the Plaintiff on the Evening of December 24, 2000

The principal factual dispute in this matter concerns whether SSgt. Parker was in operation of his assigned GOV when said vehicle struck the plaintiff on the evening of December 24, 2000.  The plaintiff contends that SSgt. Parker operated the GOV which struck her person.   As discussed *supra*, SSgt. Parker has denied operating the GOV at any time following the evening of December 22, 2000.

The Court finds that the plaintiff has demonstrated by a preponderance of the evidence that SSgt. Parker was in operation of his assigned GOV and struck the plaintiff with said vehicle on December 24, 2000.   It is undisputed that the vehicle which struck the plaintiff was the GOV assigned to SSgt. Parker.  See (Tr. at 3).  SSgt. Parker was in possession of one of the two sets of keys for the GOV, with the other set remaining at the Salem, OH local office.   See (Tr. at 145-46, 158; Yukich Dep. at 27-29).   There lacks any evidence that another individual utilized the set of keys stored at the Salem, OH local office.   Det. Lomax testified that there lacked any evidence indicating that Parker's GOV was subjected to forcible entry.  See (Tr. at 91).   Consequently, the evidence before the Court indicates that SSgt. Parker was the lone individual that had the means to operate the GOV at the time of the accident.

In addition, the Court finds as credible Maddox's statement which places SSgt. Parker operating the GOV in the vicinity of, and immediately prior to, the accident.   See (Maddox

V.S.).   Specifically, Maddox's statement indicates that SSgt. Parker had been drinking alcohol at a party immediately prior to the accident and thereafter operated his assigned GOV at a high rate of speed near the scene of the accident.   See (Maddox V.S.).   SSgt. Parker then telephoned Maddox, advised that he had been involved in an automobile accident, and requested to be picked up near the scene of the accident.   See (Maddox V. S.).   Five witnesses – Lonnie Dallas, Katherine McCall, Shawn McCall, Jennifer Scott, and Shelika Wilder – observed SSgt. Parker at the December 24, 2000 party displaying conduct in a manner consistent with Maddox's version of events.   See (Dep. of Lonnie Dallas, Mon. August 16, 2004 at 10-12; Dep. of Katharine McCall, Mon. Aug. 16, 2004 at 6, 9; Dep. of Shawn McCall, Mon. Aug. 16, 2004 at 6; Dep. of Jennifer Scott. Thus. Aug. 19, 2004 at 9, 14-17, 21; Dep. of Shelika Wilder, Tues. Jan. 4, 2005 Vol. III at 55, 60).   SSgt. Parker presents no evidence, other than a blanket denial, tending to refute Maddox's statement.   See (Tr. at 141). In light of the corroborating testimony of five credible and disinterested witnesses, and the dearth of evidence to the contrary, this Court affords conclusive weight to Maddox's statement that SSgt. Parker: (a) was operating his GOV on December 24, 2000 at the time, and near the scene of, the plaintiff's accident; (b) was involved in an automobile accident on December 24, 2000; and (c) required to be picked up near the scene of the accident.

        This Court further finds SSgt. Parker's claim that the GOV was stolen following his parking the vehicle on the evening of December 22, 2000 as wholly unsupported by the record.   As discussed *supra*, there lacks any physical evidence, such as a damaged steering column or a damaged window, tending to demonstrate that the GOV was subject to forcible entry.   See (Tr. at 91).   Det. Lomax testified that based upon his nineteen years of experience

as a police officer, as well as the condition of the GOV, that it was his opinion that the GOV was not stolen. <u>See</u> (Tr. at 91-92). Det. Lomax placed particular emphasis on the lack of keys in the abandoned GOV. <u>See</u> (Tr. at 91-92). Det. Lomax explained:

> I've investigated quite a few hit and run accidents. One of the key factors with a hit and run accident and stolen vehicles, the majority of the people who leave the vehicle, they just jump out and run away. They don't take time to take the keys with them because all they want to do is get away. It's not their personal vehicle, so they're not concerned with doing things like that. However, these keys were not present with the vehicle.

(Tr. at 91-92.)

Moreover, having the opportunity to observe the demeanor and assess the credibility of SSgt. Parker while testifying, this Court affords little, if any, weight to SSgt. Parker's self-serving version of events. SSgt. Parker's persistent denials regarding his attendance at the December 24, 2000 party, notwithstanding the contrary testimony of five dis-interested witnesses, strained the bounds of credulity. Indeed, SSgt. Parker's testimony at trial repeatedly was inconsistent with, or contradicted, his prior, sworn deposition testimony. <u>See</u>, <u>e.g.</u>, (Tr. at 119-121, 133-138). In short, this Court finds SSgt. Parker's testimony as lacking in credibility.

Accordingly, in light of the oral and documentary evidence presented at trial, the Court finds that SSgt. Parker operated his assigned GOV on December 24, 2004 and struck the plaintiff with said GOV while the plaintiff was standing near the roadway (identified as the Salt Springs Road exit ramp from Interstate 680).

### III.    CONCLUSIONS OF LAW

#### A.    Federal Tort Claims Act

The plaintiff asserts in her first claim for relief that the United States is liable for the injuries that she sustained as a result of GySgt. Yukich and SSgt. Parker's conduct.  The principle of sovereign immunity requires that before a suit may be maintained against the United States, the United States must consent to being sued.  See Montez v. United States, 359 F.3d 392, 395 (6th Cir. 2004) (citing United States v. Orleans, 425 U.S. 807, 814 (1976)).  Through its enactment of the FTCA, Congress has waived the United States's immunity from suits:

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  The FTCA therefore authorizes suits against the United States "for the negligence of a federal employee acting within the scope of his employment."[3]   Young v. United States, 71 F.3d 1238, 1245 n.2 (6th Cir. 1995).  It is the United States, and not the individual federal employee, that is subject to suit under the FTCA so long as the employee's alleged "negligent or wrongful act[s]" occurred in the scope and course of federal

---

[3]The Federal Employees Liability Reform and Tort Compensation Act of 1988 (Westfall Act), Pub.L. No. 100-694, 102 Stat. 4563 (codified as amended at 28 U.S.C. § 2679 (Supp. 1989)) amended the FTCA to provide for the substitution of the United States as a defendant in an action where a federal employee is sued for monetary damages arising from a common law tort allegedly committed by the federal employee acting within the scope of his or her employment.  See generally Arbour v. Jenkins, 903 F.2d 416, 419-20 (6th Cir. 1990).

employment.    See  28  U.S.C.  §  2679(b)(1).    The  statute  effectively  "shields  [individual] federal  employees  from  liability  for  common  law  torts  committed  within  the  scope  of employment."  Henson v. NASA, 14 F.3d 1143, 1147 (6th Cir. 1994).

"Employee  of  the  government"  as  defined  in  the  FTCA  "includes  .  .  .members  of  the military  or  naval  forces  of  the  United  States."    28  U.S.C.  §  2671.    The  FTCA  further  defines "acting  within  the  scope  of  his  office  or  employment"  with  regard  to  military  personnel  as "acting  in  line  of  duty."    Id.  Whether  military  personnel  are  acting  within  the  "line  of  duty" is  determined  by  state  law  of  respondeat  superior  in  accordance  with  the  law  of  the  state where  the  negligent  act  or  omission  occurred.    See  Williams v. United States,  350  U.S.  857 (1955);  Mider v. United States, 322 F.2d 193, 197 (6th Cir. 1963).

It  follows  that  the  threshold  legal  issue  before  the  Court  is  whether  the  tortious conduct  alleged  to  have  been  committed  by  the  individual  federal  employees  identified  in  the Complaint – namely, GySgt. Yukich and SSgt. Parker – occurred while said employees were acting within the line of duty.

### 1.    Line of Duty / Scope of Employment

The  Court  readily  may  address  the  issue  of  GySgt.  Yukich's  conduct.    The  United States  Attorney's  certification  that  a  federal  government  employee  was  acting  within  the scope  of  his  employment  is  prima  facie  evidence  that  the  United  States  is  the  proper defendant.    See  Coleman v. United States,  91  F.3d  820,  823  (6th  Cir.  1996).    Here,  the United  States  Attorney  has  filed  a  notice  of  substitution  averring  that  GySgt.  Yukich  acted "within  the  scope  of  his  employment  as  an  employee  of  the  United  States"  at  the  time  of  the plaintiff's  accident.    See  (Dkt. # 17 & Ex. A attached thereto).    The  plaintiff  does  not  contest

the certification as to defendant GySgt. Yukich.   See (Tr. at 2); see also (Dkt. # 63 at 7) ("The initial finding of fact which all parties have stipulated to is that during the entire time as [NCOIC], Nicholas Yukich, was acting within the course and scope of his employment as a Staff Sergeant and the officer in charge of all recruiting sergeants assigned to RSS Youngstown.").   Thus, the Court finds that GySgt. Yukich was acting in the "line of duty" / "scope of his employment" at the time the plaintiff sustained her injuries; therefore, the United States is the proper party for claims arising from GySgt. Yukich's alleged tortious conduct.

The issue as to whether SSgt. Parker was acting in the scope of his federal employment as a USMC recruiter at the time he struck the plaintiff with his assigned GOV requires a more searching analysis.   The United States did not certify that SSgt. Parker was acting in the scope of his federal employment at the time of the plaintiff's accident.   SSgt. Parker did not initiate an action challenging the United States's certification decision.   See 28 U.S.C. § 2679(d)(3) ("In the event that the Attorney General has refused to certify scope of office or employment under this section, the employee may at any time before trial petition the court to find and certify that the employee was acting within the scope of his office or employment.").   It is the plaintiff, however, that now contends that SSgt. Parker was acting in the scope of his employment at the time of the accident.   See (Dkt. # 63 at 7-15); cf. Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 434-36 (1995) (holding that a non-federal employee plaintiff may still challenge the propriety of the certification and the substitution of the United States for the named defendants).

Because the line of duty / scope of employment analysis is governed by the law of

the state in which the conduct at issue occurred, 28 U.S.C. § 1346(b); Coleman v. United States, 91 F.3d 820, 823 (6th Cir. 1996), this Court shall target its inquiry on Ohio law.

Under Ohio law, "'[a] master is subject to liability for the torts of his servants committed while acting in the scope of their employment.'" Osborne v. Lyles, 63 Ohio St. 3d 326, 329-30, 587 N.E.2d 825, 828 (1992) (quoting RESTATEMENT OF LAW 2d, AGENCY (1958) 481, Section 219(1)). Respondeat superior liability attaches only where the work performed is that of the master, and the servant is subject to the master's control in performing the master's work. See Boch v New York Life Ins. Co., 175 Ohio St. 458, 196 N.E.2d 90, paragraph one of the syllabus (1964). It follows that an employee acts within the scope of his employment "when the act can fairly and reasonably be deemed to be an ordinary and natural incident or attribute of the service to be rendered, or a natural, direct, and logical result of it." Posin v. A.B.C. Motor Court Hotel, Inc., 45 Ohio St. 2d 271, 278, 344 N.E.2d 334, 339 (1976). In contrast, an employee is not acting within the scope of employment if its acts are self-serving and in no way facilitate or promote business, or for "'an intentional and wilful attack committed by an agent or employee, to vent his own spleen or malevolence against the injured person.'" Woods v. McGuire, 954 F.2d 388, 390 (6th Cir. 1992) (quoting Byrd v. Faber, 57 Ohio St. 3d 56, 59, 565 N.E.2d 584 (1991), and Schulman v. Cleveland, 30 Ohio St. 2d 196, 198, 283 N.E.2d 175 (1972)).

While "scope of employment . . . is a question of fact and each case is sui generis," Posin, 45 Ohio St.2d at 278, 344 N.E.2d at 339, Ohio courts generally look to the factors presented in the Restatement of the Law 2d, Agency (1957), Section 228, to define what conduct falls within the term. See, e.g., Akron v. Holland Oil Co., 102 Ohio St.3d 1228,

-14-

2004 Ohio 2834, at P12-15, 809 N.E.2d 666 (Pfeifer, J., dissenting); Amato v. Heinika, Ltd., 2005 Ohio 189 (Ohio 8th App. Dist. 2005).  The Restatement provides, in pertinent part, that: "conduct of an employee is within the 'scope of employment' when: (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; [and] (c) it is actuated, at least in part, by a purpose to serve the master." RESTATEMENT OF LAW 2d, AGENCY (1958), Section 228.

An application of the foregoing factors to the present action reveals that SSgt. Parker was acting outside the scope of his employment as a USMC recruiter at the time he struck the plaintiff with the GOV.  First, it is uncontroverted that SSgt. Parker was not performing any recruitment functions on December 24, 2000.  Therefore, SSgt. Parker cannot be said to have been engaging in conduct "of the kind he [was] employed to perform" at the time of the accident.

Secondly, it is undisputed that SSgt. Parker had express authorization to utilize the GOVs, absent exigent circumstances, for the exclusive purpose of recruitment.  See (Dkt. # 63 at 14) ("Plaintiff is not arguing with the general policy associated with the use of [GOVs]; that they were, in a general sense, to be used for only government purposes.  That clearly was the policy that existed absent exigent circumstances at the time.").  Each recruiter received intensive training prior to being stationed at RS Cleveland regarding the USMC policy prohibiting the use of GOVs for personal purposes.  See (Tr. 15-16, 173-75, 177-79, 202-03; Grabowski Dep. at 43-49; Yukich Dep. at 29-30).  Lt. Col. Valli likewise established a jurisdiction-wide policy expressly prohibiting the use of GOVs for personal use.  See (Gov.'s Ex. Aq); see also (Tr. at 24-27, 124).  Every recruiter that testified, including SSgt. Parker,

acknowledged the existence of the GOV policies and admitted to receiving training regarding the same.  <u>See</u> (Tr. at 104, 165, 168, 203).  Furthermore, the recruiters were on holiday leave at the time of the accident.  Indeed, GySgt. Yukich explicitly ordered the recruiters to refrain from using the GOVs during December 22, 2000 through December 26, 2000.  <u>See</u> (Tr. at 138-39, 146-47).  It therefore is the lone reasonable conclusion to be drawn from the record that SSgt. Parker did not have express authorization to utilize the GOV at the time of the accident.

The plaintiff attempts to compel a contrary result by alleging that SSgt. Parker had implied authority to operate the GOV at the time of the accident.  The plaintiff specifically alleges:

> the evidence solicited during the trial clearly demonstrates that all recruiting sergeants at RSS Youngstown in the year preceding Plaintiff Megan Weidner's accident were given express and implied permission by their commanding officer, [GySgt.. Yukich], to use their military vehicles for personal reasons. With this permission, all of the recruiting sergeants did in fact use their government vehicles for personal reasons.  And, lastly, there were no reprimands, punishments, or ramifications of any manner for this practice. Therefore, . . . officers in Youngstown were given permission to use their vehicles by the individual who was in charge of their daily activities NCOIC [GySgt.] Yukich.

(Dkt. # 63 at 11.)  In support of her contention, the plaintiff places particular emphasis on the recruiters' testimony that they observed GySgt. Yukich, as well as "every recruiter" at RSS-Youngstown, (Tr. at 167), routinely using GOVs for personal use.  <u>See</u> (Dkt. # 63 at 7) (citing Tr. at 106, 167, 210)).

As an initial matter, the Court recognizes that a significant question exists as to whether the plaintiff's attempt to expand the scope of employment analysis is cognizable

under the FTCA.  Cf. Primeaux v. United States, 181 F.3d 876, 878 (8th Cir. 1999) (en banc) (holding that apparent authority, as a separate theory of vicarious liability, should not be considered in FTCA claims). Assuming *arguendo*, that such a theory may be raised in a FTCA action, the plaintiff nevertheless fails to demonstrate that SSgt. Parker acted with such authority on December 24, 2000.

It is well-established under Ohio law that "[c]ontinued acquiescence in the performance of a previously unauthorized act ripens into tacit approval and authorization." Miller v. Metropolitan Life Ins. Co., 134 Ohio St. 289, 293, 12 Ohio Op. 93, 16 N.E.2d 447 (1938).  Relying on Miller and its progeny, the plaintiff contends:

> [The] general policy was plainly superceded by the very specific and clear actions of [SSgt.] Parker's commanding officer [GySgt. Yukich]. [NCOIC GySgt. Yukich] was the officer who was directly in charge of [SSgt.] Parker's day-to-day activities. [GySgt.] Yukich had the authority to direct [SSgt.] Parker in all aspects of his military life, including the extent and scope of [SSgt.]Parker's use of military vehicles. [GySgt.] Yukich gave [SSgt.] Parker, by virtue of his actions and words, permission to use the government vehicles for personal reasons.   It is interesting to note that the United States government does not disagree with this fact.

(Dkt. # 63 at 14.)

As an initial matter, the record lacks any indication that GySgt. Yukich explicitly authorized SSgt. Parker to utilize the GOV for personal reasons.  The lone instance found in the record where GySgt. Yukich explicitly authorized a recruiter to deviate from the general policy was in the instance of Sergeant Sean Hamilton ("Sgt. Hamilton").  Sgt. Hamilton testified that GySgt. Yukich authorized him to drive domicile to duty on occasion due to the location of his residence.  See (Tr. at 166).  The record lacks any indication as to whether GySgt. Yukich followed Lt. Col. Valli's procedures for granting this authority. Irrespective

-17-

of Sgt. Hamilton's testimony, there is no any evidence to support the plaintiff's contention that GySgt. Yukich explicitly authorized SSgt. Parker to utilize the GOV for personal reasons.

The Court concurs, however, in the plaintiff's factual assertion that recruiters at RSS Youngstown, including GySgt. Yukich, frequently used their assigned GOVs in a manner inconsistent with USMC policy, as well as the policy issued for the RS Cleveland command jurisdiction.  The Court concurs, in a general sense, that such acquiescence and participation may constitute authorization under Ohio law.  See Miller, 134 Ohio St. at 293.  Two recruiters testified that they observed GySgt. Yukich and various other recruiters repeatedly utilizing the GOVs for personal purposes.  See (Tr. 105-07, 116, 166-67).  As discussed supra, one recruiter, Sgt. Hamilton, testified that GySgt. Yukich gave him express permission to deviate from the general policy.  No evidence exists that any recruiter was subjected to discipline for personal use of the GOVs.

Nonetheless, GySgt. Yukich's apparent acquiescence and participation in violations of the general policy does not "ripen into tacit approval authorization" of SSgt. Parker's conduct on December 24, 2000.  SSgt. Parker's own testimony reveals that he was well aware that he did not have authorization to operate the GOV for personal purposes.  SSgt. Parker testified at trial that he understood GySgt. Yukich's orders on December 22, 2000 to prohibit him from operating the GOV from that evening until December 26, 2000.  See (Tr. at 110-114, 138-39, 146-47). Specifically, SSgt. Parker testified:

> It's the weekend.  Or, we're having a three-day weekend, you know, you park you're vehicles, they're not to be driven.
>
> But when that happens, everybody goes – whether they go to their respective recruiting offices and park it or not, that pretty much was left up to

the recruiter.  **It was just if you got caught you get caught and you will be reprimanded for it.**  If you don't, then it's okay.

(Tr. at 146-47) (emphasis added).  SSgt. Parker's express awareness that he lacked authority to use the GOV for personal purposes on December 24, 2000 negates any inference that he had implicit authority to utilize the GOV to meet with his paramour.

Turning to the final factor in assessing whether SSgt. Parker acted within the line of duty / scope of employment, the Court finds that it cannot reasonably argued that SSgt. Parker's use of the GOV to attend a holiday party with his paramour was actuated in any part "by a purpose to serve his master" – the USMC.

The Supreme Court of Ohio has held that "[t]o sever the servant from the scope of his employment, the act complained of must be such a divergence from his regular duties that its very character severs the relationship of master and servant." Posin, 45 Ohio St. 2d at 278, 344 N.E.2d at 339 (citing Amstutz v. Prudential Ins. Co., 136 Ohio St. 404, 16 O.O. 572, 26 N.E.2d 454 (1940)).  Here, SSgt. Parker: (a) violated the policies of the USMC and those enacted in his command jurisdiction; (b) disobeyed a direct order issued from the individual having supervision over his daily activities; (c) engaged in conduct knowing that it was unauthorized by his employer; and (d) such conduct was wholly unrelated to his employment as a USMC recruiter.  The Court is left with the inescapable conclusion that SSgt. Parker's personal frolic severed any relationship with his employment.  See Mider v. United States, 322 F.2d 193, 196-97 (6th Cir.1963) (holding that under Ohio law "there can be no vicarious liability for an employee's torts if the negligent act occurs when the employee, although using his employer's vehicle, is off duty or is on a personal excursion for his own purposes")

(citation omitted). It follows that the United States is not a proper party to suit for injuries arising from SSgt. Parker's conduct. See Mider, 322 F.2d at 196-97 ("No one, not even an officer of the highest rank in the Armed Forces, may subject the government to liability for injuries resulting from the dispatch of a motor vehicle, for an unofficial and unauthorized purpose, to a member of the Armed Forces not acting within the scope of his employment, or line of duty.").

### 2. The liability of the United States under the FTCA

As discussed *supra*, the United States is subject to liability in this matter for any injuries sustained by the plaintiff that were caused by the negligence of GySgt.Yukich. The plaintiff has not presented any evidence indicating that GySgt. Yukich acted in a manner which caused her injuries.

Accordingly, judgment is awarded in favor of the United States on the plaintiff's first claim for relief.

### B. Negligence

The plaintiff alternatively advances negligence claims against SSgt. Parker and GySgt. Yukich. As the plaintiff has not presented any evidence indicating that GySgt. Yukich acted in a manner which caused her injuries, judgment is awarded to Gy. Sgt. Yukich on the plaintiff's third claim for relief.

Turning to the claim advanced against SSgt. Parker, in order to prove negligence under Ohio law a plaintiff must prove the defendant owed the plaintiff a duty, the defendant breached that duty, and the plaintiff suffered damages as a result of that breach. See Chambers v. St. Mary's School, 82 Ohio St. 3d 563, 565, 697 N.E.2d 198, 200 (1998).

Various Ohio statutes establish the duty owed by SSgt. Parker to the plaintiff in this case. For example, Ohio Revised Code section R.C. 4511.202 prohibits the operation of a motor vehicle on any street or highway without the driver being in reasonable control of the vehicle. See OHIO REV. CODE ANN. § 4511.202. Ohio Revised Code section 4511.21(A), states in pertinent part that ". . . no person shall drive any motor vehicle . . . in and upon any street or highway at a greater speed than will permit the person to bring it to a stop within the assured clear distance ahead." OHIO REV. CODE ANN. § 4511.21(A). Sections 4511.25 and 4511.29 impose a mandatory duty upon a motorist to drive solely upon the right half of a roadway except under specifically designated circumstances. See OHIO REV. CODE ANN. §§ 4511.25, 4511.29.

The Court has determined that SSgt. Parker struck the plaintiff with his assigned GOV on December 24, 2000 while the plaintiff was standing off the roadway (identified as the Salt Springs Road exit ramp from Interstate 680) in order to observe an occupant of a vehicle in which she was riding change a flat tire. In so striking the plaintiff, SSgt. Parker breached all of the foregoing duties. See Pond v. Leslein, 72 Ohio St.3d 50, 53, 647 N.E.2d 477 (1995); Roszman v. Sammett, 26 Ohio St.2d 94, 96, 269 N.E.2d 420 (1971). The parties have stipulated that the plaintiff's injuries to her lower extremities were caused by the accident. See (Tr. at 4). Furthermore, SSgt. Parker has not raised any defense, other than denying that he operated GOV, negating his liability.

Consequently, the Court finds that judgment shall be awarded in favor of the plaintiff and against SSgt. Parker on the second claim for relief.

### C.    Damages

The plaintiff requests damages in the amount of $1.5 million for injuries that she sustained as a result of SSgt. Parker's negligence.   The medical evidence before the Court demonstrates that the plaintiff suffered several injuries as a result of the accident including: (1) a left closed femoral shaft fracture; (2) right posterior knee dislocation; (3) a right foot fracture; and (5) severe bruising.   See (Pl.'s Ex. # 1).   The plaintiff underwent multiple surgeries to treat these injuries which ultimately resulted in her having a pin inserted into her left leg as well as the partial amputation of her right foot.   See (Pl.'s Ex. # 1).   The plaintiff testified as to the extreme and prolonged pain caused by these surgeries and treatments.   See (Tr. at 62-64).   The costs of all medical treatments and physical therapy were approximately $93, 884.34, which remains due and owing.   See (Pl.'s Ex. # 2).

The plaintiff's injuries resulted in scarring, particularly in the area of her right foot and left arm.   The plaintiff has indicated that she has limitations in gaining employment that requires her to stand for any period of time.   See (Tr. at 66-67, 70-71).   The plaintiff further has indicated that she makes significant efforts to hide the scarring from her children and the public (i.e., not wearing open toe shoes).   See (Tr. at 66-67).

Upon consideration of the testimony in this case, the medical records presented to the Court, and the nature of the tortious conduct, the Court awards total damages to the plaintiff in the amount of $250,000.00 plus interest from the date of judgment and costs.

### IV.    CONCLUSION

For the foregoing reasons, the Court hereby orders that judgment shall be rendered in favor of the plaintiff on the second claim for relief alleging negligence against defendant

Anthony J. Parker in the amount of $250,000.00 plus interest from the date of judgment and costs.  The Court further orders that judgment shall rendered in favor of the defendants on all remaining claims.


**IT IS SO ORDERED.**

/s/ *Peter C. Economus* - **June 30, 2005**
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**